Michael R. Reese (Cal. State Bar No. 206773)
*mreese@reesellp.com*
**REESE LLP**
100 West 93rd Street, 16th Floor
New York, New York 10025
Telephone: (212) 643-0500
Facsimile: (212) 253-4272

George V. Granade (Cal. State Bar No. 316050)
*ggranade@reesellp.com*
**REESE LLP**
8484 Wilshire Boulevard, Suite 515
Los Angeles, California 90211
Telephone: (310) 393-0070
Facsimile: (212) 253-4272

*Counsel for Plaintiff*
*and All Others Similarly Situated*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| YAROSLAV SURIS, *on behalf of himself and all others similarly situated*, <br><br> Plaintiff, <br><br> v. <br><br> ACTIVISION PUBLISHING, INC., <br><br> Defendant. | Case No. 21-cv-1312 <br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Yaroslav Suris ("Plaintiff") brings this Complaint against Activision Publishing, Inc. ("Activision" or "Defendant"), on behalf of himself and all others similarly situated as defined below and respectfully alleges as follows. Plaintiff bases the allegations herein on personal knowledge as to matters related to, and known to, him. As to all other matters, he bases his allegations on information and belief, through investigation of his counsel.

## NATURE OF THE ACTION

1.      This action is a proposed class against Activision for misleading consumers during the period October 1, 2015 to January 1, 2019 ("Class Period") about the most substantial component of Activision's flagship video game Guitar Hero Live ("Products") that provided the vast majority of songs (92%) for play.

2.      Guitar Hero Live is a music video game in which players use a unique guitar-shaped controller to "play" along with music tracks by contemporaneously matching, on the controller, guitar fret patterns that the game scrolls on screen.

3.      Activision launched Guitar Hero Live for consoles in October 2015 and for Apple TV and iOS devices in November 2015.

4.      The Products offered two gaming modes: (1) "Guitar Hero TV" or "GHTV" mode, which, to be playable, required the use of an online streaming service that Activision provided, and (2) "Guitar Hero Live" or "GH Live" mode, which allows players to use the game without the streaming service, to a limited extent.

5.      As of November 1, 2018, the Guitar Hero TV streaming service offered 484 playable tracks.

6.      The Guitar Hero Live mode offers 42 playable tracks.

7.     Thus, the Guitar Hero TV streaming service offered 92% of the playable music tracks within the Guitar Hero Live Products.

8.     The Guitar Hero Live Products also allowed players to purchase in-game currency called "Hero Cash" using real money.

9.     Players could use Hero Cash within the Guitar Hero Live Products to purchase "Premium" or "Exclusive" content, including some Premium and Exclusive content that was not available unless players purchased it with Hero Cash.

10.     In marketing and selling the Guitar Hero Live Products, Activision prominently and conspicuously represented that the Products were playable online. Activision represented that the Products included the GHTV mode, which it prominently and conspicuously stated is a "playable music video network." Activision also marketed the GHTV mode as, among other things, a "continuous broadcast of music videos," "running 24-hours a day, seven days a week."

11.     On December 1, 2018—only three years after Activision launched the Guitar Hero Live Products and in violation of Activision representations— Activision eliminated 92% of the game's playable music tracks by terminating the online feature.

12.     Furthermore, consumers who purchased Hero Cash lost access to that Hero Cash on and after December 1, 2018.

13.     And, consumers who purchased Premium or Exclusive content lost access to that Premium or Exclusive content on and after December 1, 2018. *Id.* (click "What happened to the content I unlocked for accessing Premium Shows?").

14.     As detailed below, Plaintiff brings this action on behalf of himself and other similarly situated consumers.

## PARTIES

### Plaintiff Yuroslav Suris

15.     Plaintiff Yuroslav Suris resides in Brooklyn, New York. Plaintiff has no intention of changing his residence.

16.     Plaintiff bought Guitar Hero Live for a premium of approximately $300 as a present for his pre-teen son.  Plaintiff expected that GuitarHero Live would provide online play for as long as his family owned Guitar Hero Live.

17.     Plaintiff did not set up Guitar Hero Live; rather, that was accomplished by his pre-teen son.  As a result, Plaintiff did not agree to any End User Licensing Agreement ("EULA"), or any terms contained therein.  Plaintiff did not agree to arbitrate any of his claims.  Plaintiff also did not agree to waive his right to pursue this matter as a class action.  Plaintiff also did not agree to waive his right to seek remedies under the consumer protection and related laws of his resident state of New York.

18.     In deciding to purchase the Guitar Hero Live Product, Plaintiff relied upon Activision's representations that the Guitar Hero Live Product would provide a vast music video network of songs to play.

19.     At the time Plaintiff purchased the Guitar Hero Live Product, Plaintiff reasonably expected that Activision would not subsequently eliminate the ability to use the vast majority (92%) of the Product's playable music tracks.

20.     Had Plaintiff known at the time he purchased the Guitar Hero Live Product that Activision would subsequently eliminated 92% of the game's playable music tracks, he would not have purchased the Product or paid the price he paid for the Product.

**Defendant Activision Publishing, Inc.**

21.     Defendant Activision Publishing, Inc., is a corporation organized under the laws of the State of Delaware.

22.     Activision Publishing, Inc.'s principal executive office is located at 3100 Ocean Park Boulevard, Santa Monica, California 90405.

## ALLEGATIONS COMMON TO ALL CLAIMS

23.     Guitar Hero Live is a music video game that requires players to use a special guitar-shaped controller that is unique to, and only works with, Guitar Hero Live.

24.     Below is an image of the Guitar Hero Live controller.



25.     Guitar Hero Live gameplay features guitar fret patterns that the game scrolls on screen.

26.     The goal of the game is to use the guitar-shaped controller to match or "play" the patterns in time with the music.

27.     The music that Guitar Hero Live makes available to "play" in such a manner spans a diverse selection of music genres.

28.     In October 2015, Activision released the "Guitar Hero Live" game for video game

consoles including PlayStation 4, PlayStation 3, Xbox One, Xbox 360, and Wii U.

29.     The Guitar Hero Live Products offered two gaming modes: (1) "Guitar Hero TV" or "GHTV" mode, which, to be playable, required the use of an online streaming service that Activision provided, and (2) "Guitar Hero Live" or "GH Live" mode, which allows players to use the game without the streaming service, to an extremely limited extent.

30.     Each video game console version of the Product included both the GH Live play mode and the GHTV play mode.

31.     The operating system for Apple Inc.'s television product, the Apple TV, is called "tvOS."

32.     The operating system for Apple Inc.'s iPhone, iPad, and iPod Touch products is called "iOS."

33.     In November 2015, Activision launched the "Guitar Hero Live" game for Apple TV and iOS.

34.     The Apple TV version of Guitar Hero Live included the full game for both tvOS and iOS (i.e., both the GH Live play mode and the GHTV play mode).

35.     The Apple TV version of the "Guitar Hero Live" game is only playable with the guitar-shaped controller.

36.     The iOS version of Guitar Hero Live included the full game for iOS only (i.e., both the GH Live play mode and the GHTV play mode).

37.     The iOS version of Guitar Hero Live is playable with the guitar-shaped controller. It is also playable without the controller, by tapping the screen of the iOS device (such as an iPad).

38.     Activision prominently and conspicuously represented to consumers in the marketing for the Guitar Hero Live Products that the Products have online play capabilities.

39.     For example, the boxes and marketing (including online box images) for the Guitar

Hero Live Products prominently and conspicuously made the following representations (or

substantially similar representations):ONE GAME, TWO WAYS TO PLAY

GHLIVE
ROCK REAL CROWDS WITH REAL REACTIONS
GHTV
WORLD'S FIRST **PLAYABLE MUSIC VIDEO NETWORK**





40.     For another example, on its website for the Guitar Hero Live Products, on June 14, 2017, Activision stated:

GHTV | THE WORLD'S FIRST PLAYABLE MUSIC VIDEO NETWORK

ALL PLAYABLE. ALL THE TIME

GHTV is *a continuous broadcast of music videos* where you and your guitar controller are the star. Hundreds of videos will be available at launch spanning all different genres of music, *with new videos continually added to the line-up. You'll be able to discover and play new songs all the time.*

ACTIVISION PUBL'G, INC., *GHTV: The World's First Playable Music Vide Network*, WWW.GUITARHERO.COM (June 14, 2017) (emphasis added),

https://www.guitarhero.com/game/ghtv

[https://web.archive.org/web/ 20170614015159/https://www.guitarhero.com/game/ghtv].

41.     On the same page, Activision went on to state:

ROCK WITH FRIENDS

GHTV makes it more fun to play with your friends than ever. . . . Plus, GHTV delivers exciting competition, no matter your skill level. Compete in your living room *or online with people from all over the world*, playing at similar progression levels and difficulty as you. . . .

*Id.* (emphasis added).

42.     Presumably pursuant to an agreement with Activision, retailer Best Buy marketed GHTV mode as "an *always-on music video network*, where you can play along in real time, discover new music, and challenge friends around the world." *Guitar Hero Live Video Games*, WWW.BESTBUY.COM (2018) (emphasis added), https://www.bestbuy.com/site/franchises/guitar-hero/pcmcat376300050004.c?id= pcmcat376300050004 (page no longer available).

43.     On the same webpage, Best Buy stated:

GHTV is *a 24-hour, always-on, playable music video network* where you and your guitar are the stars. With over 150 videos available from the start, the feed will be continuously updated with hits from yesterday and today.

\* \* \* \* \*

GHTV doubles as a live competition between friends and music fans all over the world.

*Id.* (emphasis added).

44.     Activision's website for the Guitar Hero Live Products states, in a set of frequently asked questions:

*WHAT IS GHTV?*

GHTV is *a continuous broadcast of music videos* where you and your guitar controller are the star. Hundreds of videos are available now spanning all different genres of music, *with new videos continually added to the line-up. You're able to discover and play new songs all the time.*

ACTIVISION PUBL'G, INC., *FAQs*, WWW.GUITARHERO.COM (2018) (emphasis added), https://www.guitarhero.com/faq.

45.     Activision also represented on the Guitar Hero Live Product website as follows:

*HOW MANY SONGS ARE AVAILABLE IN GUITAR HERO LIVE?*

Between GH Live and GHTV there are hundreds of songs available now, *with new songs being added to GHTV continually*.

*Id.* (emphasis added).

46.     As of November 1, 2018, 484 songs were available online via Guitar Hero TV.

47.     The GH Live mode within the Products includes 42 songs that do not require the Internet to use.

48.     As Macworld explained in December 2015, just after the launch of all Products, "[w]ith 42 songs, the main Live soundtrack is slimmer than past Guitar Hero entries, *but there's*

*a reason for that: GHTV, the online streaming side of the game*." Andrew Hayward, *Guitar Hero Live for iOS and Apple TV: Almost the full guitar experience, plus something more*, WWW.MACWORLD.COM (Dec. 15, 2015 4:30 PM PST) (emphasis added), https://www.macworld.com/article/3015017/ios/guitar-hero-live-for-ios-and-apple-tv-almost-the-full-guitar-experience-plus-something-more.html. Macworld continued, "GHTV delivers always-on programming as part of the package." *Id.*

49.    The Guitar Hero Live Products do not allow, and have never allowed, players to download the songs available on Guitar Hero TV.

50.    The Guitar Hero Live Products do not provide backward compatibility with previous games or controllers from the Guitar Hero franchise.

51.    The Guitar Hero Live Products also made use of an in-game currency called "Hero Cash."

52.    Activision's website stated:

Hero Cash is ***currency that's bought in packs using real world money***. Hero Cash can be used to bypass the in-game challenges needed to access Premium items, Premium Shows, and Play Tokens.

ACTIVISION PUBL'G, INC., *Guitar hero Live Currency System and In-Game Purchases*, SUPPORT.ACTIVISION.COM (2018) (emphasis added), https://support.activision.com/articles/en_US/FAQ/Guitar-Hero-Live-Currency-System-and-In-Game-Purchases/.

53.    There were some "Premium" and "Exclusive" items within the Guitar Hero Live Products that were only available using Hero Cash. *Id.*

54.    In other words, the Products included features that incentivize the purchase of Hero Cash with real world money.

55.     On December 1, 2018, Activision terminated GHTV, thereby eliminating 92% of the playable songs (or 484 songs) available within the Products.

56.     Furthermore, the December 1, 2018, shutdown ended consumers' access to Premium or Exclusive content, including any and all Premium or Exclusive content that consumers purchased using Hero Cash.

57.     Furthermore, the December 1, 2018, shutdown deprived consumers of real money that the consumers spent within the Guitar Hero Live Products on Hero Cash.

58.     In deciding to purchase the Guitar Hero Live Product, Plaintiff relied upon Activision's representations indicating that the Guitar Hero Live Product had a music video network of hundreds of songs for play.

59.     Similarly, when other consumers purchased the Product, the other consumers relied upon Activision's representations indicating that the Products had a music video network of hundreds of songs for play.

60.     At the time Plaintiff purchased the Guitar Hero Live Product, Plaintiff reasonably expected that Activision would not subsequently eliminate the ability to use the vast majority (92%) of the Product's playable music tracks.

61.     Similarly, at the time other consumers purchased the Product, the other consumers reasonably expected that Activision would not subsequently eliminate their ability to use the vast majority (92%) of the Product's playable music tracks.

62.     Had Plaintiff known at the time he purchased the Guitar Hero Live Product that Activision would eliminate hundreds of songs for play, he would not have purchased the Product or paid the price he paid for the Product.

63.     Similarly, had other consumers known at the time they purchased the Product that

Activision would subsequently eliminate hundreds of songs, the other consumers would not have purchased the Product or paid the price they paid for the Products.

64.     Plaintiff and other consumers reasonably relied to their detriment on Activision's misleading representations.

65.     As an immediate, direct, and proximate result of Defendant's deceptive representations, Defendant injured Plaintiff and other consumers in that they:

      a.    paid a sum of money for Products that were not what Defendant represented;

      b.    paid a premium price for Products that were not what Defendant represented;

      c.    were deprived of the benefit of the bargain because the Products they purchased had less value than what Defendant represented;

      d.    did not receive Products that measured up to their expectations, which Defendant created; and

      e.    were denied the benefit of the vast majority of the songs that Activision promised.

66.     Had Defendant not made the false, misleading, and deceptive representations, Plaintiff and other consumers would not have been willing to pay the same amount for the Products they purchased, and, consequently, Plaintiff and the other consumers would not have been willing to purchase the Products.

67.     Based on Activision's misleading and deceptive representations, it was able to, and did, charge a premium price for the Products.

## CLASS ALLEGATIONS

68.     Plaintiff brings this matter on behalf of himself and those similarly situated. As detailed at length in this Complaint, Defendant orchestrated deceptive marketing and labeling practices. Defendant's customers were uniformly impacted by and exposed to this misconduct. Accordingly, this Complaint is uniquely situated for class-wide resolution.

69.     The Class is defined as all New York residents who purchased the Products during the Class Period (the "Class").

70.     The Class is properly brought and should be maintained as a class action under Rule 23(b), satisfying the class action prerequisites of numerosity, commonality, typicality, and adequacy because:

Numerosity: Class Members are so numerous that joinder of all members is impracticable. Plaintiff believes that there are thousands of consumers who are Class Members described above who have been damaged by Defendant's deceptive and misleading practices.

Commonality: The questions of law and fact common to the Class Members which predominate over any questions which may affect individual Class Members include, but are not limited to:

a.      Whether the Defendant is responsible for the conduct alleged herein which was uniformly directed at all consumers who purchased the Products;

b.      Whether Defendant's misconduct set forth in this Complaint demonstrates that the Defendant has engaged in unfair, fraudulent, or unlawful business practices with respect to the advertising, marketing, and sale of its Products;

c.      Whether Defendant's false and misleading statements concerning its Products were likely to deceive the public; and

14

d.     Whether Plaintiff and the Class are entitled to money damages under the same causes of action as the other Class Members.

Typicality: Plaintiff is a member of the Class. Plaintiff's claims are typical of the claims of each Class Member in that every member of the Class was susceptible to the same deceptive, misleading conduct and purchased the Defendant's Products. Plaintiff is entitled to relief under the same causes of action as the other Class Members.

Adequacy: Plaintiff is an adequate Class representative because his interests do not conflict with the interests of the Class Members he seeks to represent; his consumer protection claims are common to all members of the Class and he has a strong interest in vindicating his rights; he has retained counsel competent and experienced in complex class action litigation and they intend to vigorously prosecute this action. Plaintiff has no interests which conflict with those of the Class. The Class Members' interests will be fairly and adequately protected by Plaintiff and his counsel. The Defendant has acted in a manner generally applicable to the Class, making relief appropriate with respect to Plaintiff and the Class Members. The prosecution of separate actions by individual Class Members would create a risk of inconsistent and varying adjudications.

71.     The Class is properly brought and should be maintained as a class action under Rule 23(b) because a class action is superior to traditional litigation of this controversy. Pursuant to Rule 23(b)(3), common issues of law and fact predominate over any other questions affecting only individual members of the Class. The Class issues fully predominate over any individual issue because no inquiry into individual conduct is necessary; all that is required is a narrow focus on Defendant's deceptive and misleading marketing and labeling practices.

72.     Superiority: A class action is superior to the other available methods for the fair

and efficient adjudication of this controversy because:

e.     The joinder of thousands of individual Class Members is impracticable, cumbersome, unduly burdensome, and a waste of judicial or litigation resources;

f.     The individual claims of the Class Members may be relatively modest compared with the expense of litigating the claim, thereby making it impracticable, unduly burdensome, and expensive—if not totally impossible—to justify individual actions;

g.     When Defendant's liability has been adjudicated, all Class Members' claims can be determined by the Court and administered efficiently in a manner far less burdensome and expensive than if it were attempted through filing, discovery, and trial of all individual cases;

h.     This class action will promote orderly, efficient, expeditious, and appropriate adjudication and administration of Class claims;

i.     Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action;

j.     This class action will assure uniformity of decisions among Class Members;

k.     The Class is readily definable and prosecution of this action as a class action will eliminate the possibility of repetitious litigation;

l.     Class Members' interests in individually controlling the prosecution of separate actions is outweighed by their interest in efficient resolution by single class action; and

m.    It would be desirable to concentrate in this single venue the litigation of all plaintiffs who were induced by Defendant's allegedly misleading statements.

73.    Accordingly, this Class is properly brought and should be maintained as a class action under Rule 23(b)(3) because questions of law or fact common to Class Members predominate over any questions affecting only individual members, and because a class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

## CLAIMS

### FIRST CAUSE OF ACTION
### VIOLATION OF NEW YORK GBL § 349
**(On Behalf of Plaintiff and the Class)**

74. Plaintiff repeats and realleges each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.

75. New York General Business Law Section 349 ("GBL § 349") declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state . . ."

76. The conduct of Defendant alleged herein constitutes recurring, "unlawful" deceptive acts and practices in violation of GBL § 349, and as such, Plaintiff and New York Subclass Members seek monetary damages against Defendant.

77. Defendant misleadingly, inaccurately, and deceptively presents its Products to consumers.

78. Defendant's improper consumer-oriented conduct is misleading in a material way in that it, *inter alia*, induced Plaintiff and Class Members to purchase and pay a premium for Defendant's Products.

79. Defendant made its untrue or misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

80. Plaintiff and the other Class Members have been injured inasmuch as they paid a premium for Products based on Defendant's misleading and deceptive representations. Accordingly, Plaintiff and other Class Members received less than what they bargained or paid for.

81. Defendant's deceptive and misleading practices constitute a deceptive act and

practice in the conduct of business in violation of New York General Business Law §349(a) and Plaintiff and the Class have been damaged thereby.

82.    As a result of Defendant's recurring, "unlawful" deceptive acts and practices, Plaintiff and other Class Members are entitled to monetary and compensatory damages, including, but not limited to, statutory damages of no less than $50 per unit sold in New York as well as interest, and attorneys' fees and costs.

## SECOND CAUSE OF ACTION

### VIOLATION OF NEW YORK GBL § 350
**(On Behalf of Plaintiff and the other Class Members)**

83.    Plaintiff repeats and realleges each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.

84.    N.Y. Gen. Bus. Law § 350 provides, in part, as follows:

> False advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful.

85.    N.Y. Gen. Bus. Law § 350a(1) provides, in part, as follows:

> The term 'false advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect. In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity or employment to which the advertising relates under the conditions proscribed in said advertisement, or under such conditions as are customary or usual . . .

86.    Defendant's labeling and advertisements contain untrue and materially misleading statements concerning Defendant's Products.

87.     Plaintiff and other Class Members have been injured inasmuch as they relied upon the labeling, packaging and advertising and paid a premium for the Products.  Accordingly, Plaintiff and the other Class Members received less than what they bargained or paid for.

88.     Defendant's advertising, packaging and product labeling induced the Plaintiff and Class Members to buy Defendant's Products.

89.     Defendant made its untrue and misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

90.     Defendant's conduct constitutes multiple, separate violations of N.Y. Gen. Bus. Law § 350.

91.     Defendant made the material misrepresentations described in this Complaint in Defendant's advertising, and on the Products' packaging and labeling.

92.     Defendant's material misrepresentation was substantially uniform in content, presentation, and impact upon consumers at large. Moreover, all consumers purchasing the Products were and continue to be exposed to Defendant's material misrepresentations.

93.     As a result of Defendant's recurring, "unlawful" deceptive acts and practices, Plaintiff and Class Members are entitled to monetary damages, including, but not limited to, statutory damages of $500 per unit sold in New York, as well as interest, and attorneys' fees and costs.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of himself and the Class, prays for judgment as follows:

(a)  Declaring this action to be a proper class action and certifying Plaintiff as the representative of the Class under Rule 23 of the FRCP;

(b)  Awarding monetary damages, including treble damages;

(c)  Awarding punitive damages;

(d)  Awarding Plaintiff and Class Members their costs and expenses incurred in this action, including reasonable allowance of fees for Plaintiff's attorneys and experts, and reimbursement of Plaintiff's expenses; and

(e)  Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues.

Date: March 11, 2021                         Respectfully submitted,

                                             **REESE LLP**

                                    By:   *Michael R. Reese*
                                          Michael R. Reese (Cal. State Bar No. 206773)
                                          *mreese@reesellp.com*
                                          100 West 93rd Street, 16th Floor
                                          New York, New York 10025
                                          Telephone: (212) 643-0500
                                          Facsimile: (212) 253-4272

                                          **REESE LLP**
                                          George V. Granade (Cal. State Bar No. 316050)
                                          *ggranade@reesellp.com*
                                          8484 Wilshire Boulevard, Suite 515
                                          Los Angeles, California 90211
                                          Telephone: (310) 393-0070
                                          Facsimile: (212) 253-4272

                                          *Counsel for Plaintiff and the Proposed Class*